# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Leticia P. Flores,

      Plaintiff,

v.

Carolyn W. Colvin,
Acting Commissioner of
Social Security,

      Defendant.

Civ. No. 13-3222 (ADM/JJK)

**REPORT AND
RECOMMENDATION**

David F. Chermol, Esq., Chermol & Fishman, LLC, counsel for Plaintiff.

Ann M. Bildtsen, Esq., Assistant United States Attorney, counsel for Defendant.

JEFFREY J. KEYES, United States Magistrate Judge

      Pursuant to 42 U.S.C. §§ 405(g) and 1383(c), Plaintiff Leticia P. Flores

seeks judicial review of the final decision of the Commissioner of Social Security

("the Commissioner"), who denied Plaintiff's applications for disability insurance

benefits and supplemental security income.  The parties have filed cross-motions

for summary judgment.  (Doc. Nos. 15, 17.)  This matter has been referred to the

undersigned for a Report and Recommendation pursuant to 28 U.S.C. § 636 and

D. Minn. LR 72.1.  For the reasons stated below, this Court recommends that

Defendant's motion be denied; that Plaintiff's motion be granted; and that this

matter be remanded to the Commissioner for consideration consistent with this Report and Recommendation.

## BACKGROUND

### I.   Procedural History

Plaintiff filed a Title II application for a period of disability and disability insurance benefits and a Title XVI application for supplemental security income on August 4, 2010, alleging a disability onset of June 1, 2010.  (Tr. 194–201.)[1] The Social Security Administration ("SSA") denied the applications initially and on reconsideration.  (Tr. 84–89, 100–02.)  Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), which was held on May 23, 2012.  (Tr. 40.) On June 27, 2012, the ALJ issued a decision unfavorable to the claimant. (Tr. 10–22.)  Plaintiff sought review of the ALJ's decision, but the Appeals Council denied her request for review on September 20, 2013.  (Tr. 1–3.)  The Appeals Council's denial made the ALJ's decision the final decision of the Commissioner.  *See* 20 C.F.R. § 404.981.

On November 22, 2013, Plaintiff filed the instant action with this Court seeking judicial review pursuant to 42 U.S.C. §§ 405(g) and 1383(c). (Doc. No. 1.)  The parties thereafter filed cross-motions for summary judgment. (Doc. Nos. 16, 18.)

---

[1]     Throughout this Report and Recommendation, reference to the Administrative Record (Doc. No. 13) for this case is made by using the abbreviation "Tr."

## II.   Factual Background

Ms. Flores was born on January 31, 1975.  (Tr. 44.)  On the alleged

disability onset date of June 1, 2010, she was 35 years old.  (*Id.*)  Plaintiff has an

eleventh grade education and has not received her GED.  (Tr. 46, 249.)

Ms. Flores has taken English as a Second Language classes to improve her

English skills.  (Tr. 47, 300.)  She was licensed as a Certified Nursing Assistant

("CNA") in 2001.  (Tr. 249.)  She has also worked as a CNA for Evangelical

Lutheran Good Samaritan Center and Pelican Valley Health Center.  (Tr. 204,

262–266.)  Additionally, Ms. Flores was previously employed as a factory line

worker at a turkey processing plant.  (Tr. 249.)  In her applications for disability

and supplemental income, Plaintiff alleged disability due to obesity, bilateral

carpal tunnel syndrome, reactive airway disease, headaches, elbow

degenerative joint disease, anemia, diabetes mellitus, hysterectomy, and

hypercholesterolemia.  (Tr. 15–16.)

### Medical History

The following is a summary of the relevant medical records found in the

administrative record before the court.

### Bilateral Carpal Tunnel Syndrome

In January 2010, Ms. Flores saw Dr. Julia Spina for pain in her right hand

and wrist.  (Tr. 354–56.)  An examination of Plaintiff's hand and wrist did not

reveal a specific cause or site of the discomfort.  (Tr. 354.)  In December 2010,

Ms. Flores had her first carpal tunnel evaluation with Dr. Alan Williams.  (Tr. 433.)

During this evaluation, Dr. Williams recommended that Plaintiff get an electromyography ("EMG").[2]  (*Id.*)  The EMG was conducted on January 26, 2011 and showed moderately severe compression of the median nerve on the right hand and mild compression on the left.  (Tr. 484–86.)  On February 1, 2011, Ms. Flores complained of limited grip strength in both hands.  (Tr. 486.)

On March 7, 2011, Plaintiff had open carpal tunnel surgery on her right hand.  (Tr. 492.)  Immediately following the surgery, Ms. Flores' hand was comfortable.  (*Id.*)  On March 17, 2011, Plaintiff had her sutures removed. (Tr. 522–25.)  At that appointment, Ms. Flores reported pain at a level of 6 on a scale of 10. (Tr. 522.)  During a follow-up appointment on April 5, 2011, Plaintiff had no complaints about her right hand, though she did state that she was experiencing some pain in her left wrist which interfered with her housekeeping, and she also had bilateral limitations on elbow movement.  (Tr. 452.)  Eight months after her right-hand surgery, Ms. Flores indicated to Dr. Williams that she was pleased with the results of the carpal tunnel surgery and that her tingling and nocturnal symptoms had disappeared, but she experienced shooting pains in her hand when driving, possibly a result of a very arthritic elbow condition.  (Tr. 450.)

In January 2012, Carrie Affield, a physician's assistant and Plaintiff's primary care provider, opined, for the purposes of Ms. Flores' disability application, that Ms. Flores "will have difficulty with repetitive tasks, lifting, or fine

---

[2]      Electromyography is the recording of electrical activity generated in muscle for diagnostic purposes.  *Stedman's Medical Dictionary* 576 (27th ed. 2000).

movements" with her left hand due to "chronic arm issues and carpal tunnel on the left which cannot be repaired." (Tr. 549.)  Chronic uncontrolled migraines were also referenced.  (*Id.*)  In a Physical Residual Functional Capacity Assessment conducted by way of medical records review in September 2010, a state agency consulting physician, Dr. Dan Larsen, stated that the claimant "should not do frequent pushing, pulling, gripping, grabbing, etc. with either upper extremity." (Tr. 391.)

In March 2012, Dr. Williams saw the Plaintiff with regard to left hand pain. He noted that she had a congenital deformity in both elbows that restricted forearm rotation, but for which no surgery was recommended.  (Tr. 552.)  She had symptoms in her left hand that troubled her daily, and carpal tunnel surgery was scheduled.  (*Id.*)  In April 2012, Ms. Flores had open carpal tunnel release surgery on her left hand.  (Tr. 654.)  During a follow-up appointment eight days after surgery, Ms. Flores' hand was comfortable and Dr. Williams did not anticipate any problems.  (*Id.*)  Further, Dr. Williams' noted that Plaintiff was gradually going to mobilize herself and realized it would take a few months to get her grip strength back.  (*Id.*)

On May 23, 2012, during her hearing with the ALJ, Ms. Flores stated that her left hand was the worse hand and that some puffiness and pain on the top of her hand were the primary problems with her right hand.  (Tr. 49, 53–54.)  Two days later on May 25, 2012, during a visit with Ms. Affield, Plaintiff complained of

right hand pain and swelling. (Tr. 622–23.) On June 15, 2012, Ms. Flores again complained to Ms. Affield about right hand pain and swelling. (Tr. 629, 632.)

On July 16, 2012, Ms. Flores saw Dr. Stacey Smith with a primary complaint of severe left hand pain, but also reporting right hand pain, and daily migraines. (Tr. 640.) Dr. Smith's notes from that appointment indicate that Plaintiff's physical therapy for her right hand was helping, and accordingly, Dr. Smith prescribed physical therapy on both hands. (*Id.*) On July 24, 2012, Plaintiff again saw Ms. Affield, presenting complaints of continued swollen hands, bilateral hand pain, and loss of hand strength. (Tr. 645.) Pain medications were providing no relief. (*Id.*)

### Degenerative Elbow Joint Disease

In Plaintiff's December 9, 2010, visit to Dr. Williams in regards to carpal tunnel issues, Dr. Williams reviewed x-rays taken on July 20, 2010, which revealed advanced degenerative changes in both elbows. (Tr. 433.) The condition resulted in a loss of range of forearm rotation, but was diagnosed as a genetic joint malformation rather that degenerative arthritis. (*Id.*) Examination of Ms. Flores's elbows at the University of Minnesota Medical Center on April 5, 2011, revealed osteophytic spurring on the right elbow with otherwise no osseous abnormality. (Tr. 456.) The examination revealed some degenerative changes of her bilateral elbows. (Tr. 453.) Elbow surgery was not recommended, but would be considered if there was no improvement in motion through physical therapy. (*Id.*)

6

**Physical Therapy**

Ms. Flores was prescribed and attended physical therapy on several occasions. (Tr. 405–417, 466–80, 536–41, 595–621.) However, Plaintiff demonstrated irregular attendance to her recommended physical therapy sessions. (*Id.*) In April 2011, Ms. Flores was given a prescription for physical therapy and advised to attend therapy three times a week for four weeks. (Tr. 478–80.) She attended her first session but failed to attend the following three sessions. (Tr. 466–72.) Ms. Flores started attending physical therapy again on December 30, 2011, and she attended four of her six scheduled sessions. (Tr. 474–77, 536–41, 595.) However, treatment notes indicate that Ms. Flores was advised to attend three sessions per week for six weeks. (Tr. 474–77) During the appointments she did attend, Plaintiff expressed minimal to mild complaints of pain and difficulty during therapeutic activity. (Tr. 536–41.)

From May 29, 2012 to July 16, 2012, Ms. Flores attended her physical therapy sessions with more regularity. (Tr. 596–621.) She regularly reported that she had been experiencing right wrist pain in the 8 of 10 range (Tr. 601, 605, 607, 609, 612, 614, 616, 618, 620). During these appointments, Plaintiff exhibited signs that her condition was improving, which is evidenced by her session records stating on several occasions that her overall condition was "a little better." (Tr. 607–10, 614–17, 620–21.) Additionally, Ms. Flores was able to complete the majority of session activities with only minimal complaints of pain

and difficulty, and treatment providers indicated that her overall rehabilitation potential was fair.  (Tr. 596–613, 605–06.)

**Migraine Headaches**

On December 11, 2009, Ms. Flores began taking Propranolol[3] daily for her headaches.  (Tr. 363.)  On March 5, 2012, she began taking Imitrex[4] for her headaches.  (Tr. 562.)  On May 11, 2012, after experiencing vertigo, dizziness, and headaches, Ms. Flores was given an MRI.  (Tr. 585–86.)  The MRI showed indications of either early chronic small vessel ischemic changes[5] or migraine related microvascular changes.[6]  (*Id.*)  However, the results were inconclusive because both irregularities have a similar appearance and were both possibilities, given Ms. Flores' risk factors.  (*Id.*)  The remainder of the study was unremarkable.  (*Id.*)

On July 16, 2012, Ms. Flores was referred to a neurologist for further evaluation and treatment.  (Tr. 640.)  However, there is no evidence in the record of a consultation with a neurologist.  Furthermore, though Ms. Flores continued

---

[3]    Propranolol is used in the treatment of migraine headaches. Physician's Desk Reference 3336 (59th ed. 2005).

[4]    Imitrex is used in the treatment of migraine headaches.  *Id.* at 1521.

[5]    Ischemic is local anemia due to mechanical obstruction (mainly arterial narrowing or disruption) of the blood supply. *Stedman's Medical Dictionary* 924 (27th ed. 2000).

[6]    Microvascular is defined as of, relating to, or constituting the part of the circulatory system made up of minute vessels that average less than 0.3 millimeters in diameter. Merriam Webster, *Microvascular*, http://www.merriam-webster.com/dictionary/microvascular (last visited August 4, 2014).

taking the prescribed medications throughout the alleged disability period and sporadically complained of symptoms related to her migraines, she did not consistently report migraine headaches to her various medical care providers. (*See, e.g.*, Tr. 319–30, 396–403, 418–30, 447–54, 486–88, 508–35, 542–47, 552, 561–94, 629–33, 645–50, 656–58.)  Ms. Flores complained of symptoms relating to her migraine headaches on only four occasions after her alleged disability onset date, though she saw doctors several times each year.  (*See* Tr. 618, 622–28, 634–39, 640–44.)

### III.   Testimony at Administrative Hearing

### Plaintiff's Testimony

Ms. Flores provided the information at a hearing before the ALJ on May 23, 2012.  (Tr. 40–77.)  She was thirty-seven years old; had completed the eleventh grade; and was licensed as a CNA in 2004, though she could not remember exactly.[7]  (Tr. 44, 46.)  Ms. Flores can read, write, and do simple math. (Tr. 46–47.)  She has taken English as a Second Language classes.  (Tr. 47.)  She has no additional vocational training.  (*Id.*)

At the time of the hearing, Ms. Flores had most recently been working for Pelican Valley Health Center, a nursing home.  (Tr. 47–48.)  She began working at Pelican Valley Health Center sometime in 2009 and stopped working there in September 2010.  (Tr. 47.)  Ms. Flores worked for approximately 20-30 hours per

---

[7]    Plaintiff provided conflicting information in her application for Social Security Disability.  (Tr. 249, 262.)

week.  (Tr. 48.)  She stated that her nursing home job ended because of problems with her hands, migraine headaches, and absences related to her migraines.  (*Id.*)  Prior to working at Pelican Valley Health Center, Ms. Flores worked for several years at West Central Turkey where she was responsible for putting packages of bacon in boxes.  (*Id.*)  Prior to working for West Central Turkey, she worked for the Evangelical Lutheran Good Samaritan Society as a CNA.  (Tr. 49.)

Ms. Flores is married and has four children.  (Tr. 45.)  At the time of the hearing, Plaintiff's four children were ages nineteen, thirteen, six, and four.  (*Id.*)  Two of Ms. Flores' children receive supplemental security income.  (*Id.*)  She has a driver's license and drives approximately once per week.  (Tr. 46.)  Ms. Flores testified that she is unable to work primarily because of a lack of strength in her hands.  (Tr. 49.)  Plaintiff also cited her diabetes, migraine headaches, and memory loss as additional reasons why she is unable to work.  (*Id.*)

Plaintiff stated that Carrie Affield, PA-C, is the primary healthcare professional she sees.  (Tr. 57.)  In addition, Ms. Flores testified that she saw Dr. Williams for her carpal tunnel, Drs. Lindholm and Norgard for her hysterectomy, and Dr. Joseph Garry on at least one occasion for evaluation of her hands.  (Tr. 57–58.)

Plaintiff testified that in a typical day she would get up around 6:00 a.m., wake up her children, and go back to bed.  (Tr. 64.)  Ms. Flores then stated she typically will get up again around 7:30 a.m. to bring her older children to school.

10

(Tr. 65.)  After taking the older children to school, Plaintiff typically returns to the house to be with the younger children before they go to Head Start at noon.  (*Id.*) During the morning hours when her younger children are home, Ms. Flores feeds them, helps them get dressed by picking out the clothes they will wear, and helps them find their backpacks.  (Tr. 65–66.)  Throughout the afternoon, Plaintiff helps her husband with household chores such as cleaning the table, sweeping, doing some dishes, and sorting laundry.  (Tr. 66–67.)

However, Ms. Flores testified that most household chores have become quite difficult for her.  (Tr. 67.)  Specifically, Plaintiff stated she has trouble doing dishes and laundry.  (Tr. 66–67.)  Ms. Flores stated that she is not able to do yard work or grocery shop without her husband.  (Tr. 67–69.)  Plaintiff further stated that she receives substantial assistance with household tasks and childcare from her husband, older son, and niece.  (Tr. 68.)

### Vocational Expert

Warren Haagensen testified as a vocational expert at the hearing. (Tr. 70–75.)  The ALJ asked Mr. Haagensen what type of work an individual with the following restrictions could perform: only occasionally lift and/or carry ten pounds; frequently lift and/or carry less than ten pounds; stand and/or walk with normal breaks for a total of six hours in an eight-hour work day; occasionally climb ramps and stairs; never climb ladders, ropes or scaffolds; frequently balance, stoop, kneel, crouch and crawl; limited to frequent but not constant, pushing, pulling, gripping and grabbing with both arms; no limits on fingering and

feeling; no manipulative, or no other manipulative visual or communicative limitations; avoid concentrated exposure to extreme cold, extreme heat, humidity, fumes, odors, dust, gases, poor ventilation and hazards.  (Tr. 71–72.)

Mr. Haagensen stated that there were positions in the economy for a person with such limitations, for example as a food and beverage order clerk[8] or any job in the elemental industrial jobs category.[9]  (Tr. 72.)  Moreover, with the additional limitations of only occasional pushing, pulling, gripping, and grabbing with either arm and only occasional fingering and feeling added to the previous hypothetical, Mr. Haagensen testified that there were still a limited range of jobs available in the elemental industrial jobs category.[10]  (Tr. 73–74.)  Finally, Mr. Haagensen stated that two days a month would be the maximum number of days the hypothetical individual could be absent from work.  (Tr. 74.)

## IV.   The ALJ's Findings and Decision

---

[8]     Mr. Haagensen stated there were approximately 4,500 food and beverage order clerk jobs in the regional economy, which includes North Dakota, South Dakota, Minnesota, Iowa, and Nebraska, and 230,000 nationally.  (Tr. 72.)

[9]     Elemental industrial jobs involve assembly, packaging, or some basic machine operation. Mr. Haagensen stated there were approximately 3,100 elemental industrial jobs in the regional economy and 150,000 nationally. (Tr. 72.)

[10]     The following elemental industrial jobs would still be available: fishing reel assembler, stuffer for toy and sport equipment, and ink printer.  Mr. Haagensen stated that there were approximately 900 of these jobs in the regional economy and 45,000 nationally.  (Tr. 73–74.)

The ALJ issued an unfavorable decision, concluding that Plaintiff was not under a disability within the meaning of the Social Security Act at any time from the alleged onset date of June 1, 2010, through the decision on June 27, 2012. (Tr. 13.)  Therefore, the ALJ denied Plaintiff's application for disability insurance benefits and supplemental security income.  (Tr. 13–22.)  The ALJ followed the five-step evaluation set out in the Code of Federal Regulations.  (Tr. 14–15.); *see* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  The Eighth Circuit Court of Appeals has summarized the five-step evaluation process as follows: (1) whether the claimant is currently engaged in "substantial gainful activity"; (2) whether the claimant suffers from a severe impairment that "significantly limits the claimant's physical or mental ability to perform basic work activities"; (3) whether the claimant's impairment "meets or equals a presumptively disabling impairment listed in the regulations (if so, the claimant is disabled without regard to age, education, and work experience)"; (4) "whether the claimant has the residual functional capacity to perform his or her past relevant work"; and (5) if the ALJ finds that the claimant is unable to perform his or her past relevant work then the burden is on the Commissioner "to prove that there are other jobs in the national economy that the claimant can perform."  *Fines v. Apfel*, 149 F.3d 893, 894–95 (8th Cir. 1998) (citation omitted).

At step one, the ALJ found that Plaintiff had "not engaged in substantial gainful activity since June, 1, 2010, the alleged onset date."  (Tr. 15.)  At step two, the ALJ found that Plaintiff had the following severe impairments: "obesity,

13

bilateral carpal tunnel syndrome, reactive airway disease, headaches, elbow degenerative joint disease and anemia." (*Id.*)  The ALJ also found that Plaintiff's diabetes mellitus, hysterectomy, and hypercholesterolemia did not qualify as severe impairments.  (Tr. 16.)  With respect to the diabetes, the ALJ found the Plaintiff had "consistently been on medications, which have controlled [the condition.]" (*Id.*)  As for the hysterectomy and hypercholesterolemia, the conditions were resolved within twelve months "through follow-up care and medication." (*Id.*)  Additionally, none of Plaintiff's treating sources indicated that she has "any functional limitations as a result of either of these conditions." (*Id.*)

At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R., Part 404, Subpart P, Appendix 1.  (*Id.*)  The ALJ acknowledged that the Plaintiff's combined impairments have caused some limitation in her ability to perform work activity.  (*Id.*)  However, the ALJ stated that, even "affording [Plaintiff] the benefit of the doubt as much as possible," there was no basis for additional limitations apart from those reflected in the Plaintiff's residual functional capacity, as described in step four.  (*Id.*)

At step four the ALJ concluded that –

[Plaintiff] has the residual functional capacity to perform sedentary work . . . except she can occasionally lift/carry 10 pounds and frequently lift/carry less than 10 pounds.  [Plaintiff] can stand/walk with normal breaks for 6 hours in an 8-hour workday and sit with normal breaks for 6 hours in an 8-hour workday.  [Plaintiff] can occasionally climb ramps and stairs but never climb ladders, ropes, or scaffolds.  [Plaintiff] can frequently balance, stoop, kneel, crouch

and crawl.  [Plaintiff] is able to push, pull, grip, and grab frequently with either arm.  [Plaintiff] had no limits in fingering and feeling. [Plaintiff] should avoid concentrated exposure to extreme temperatures, humidity, fumes, odors, dusts, gases, poor ventilation and hazards.  [Plaintiff] has no manipulative, visual, or communicative limitations.

(Tr. 16.)  The ALJ made those findings after considering all of Plaintiff's symptoms and comparing them with the objective medical evidence and other evidence.  (Tr. 17.)   The ALJ also concluded that Plaintiff's impairments "could reasonably be expected to cause the alleged symptoms; however, [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the . . . residual functional capacity assessment."  (Tr. 19.)  The ALJ cited the absence of complaints by Plaintiff about her right hand following surgery, the lengthy passage of time before Plaintiff had surgery on her left hand, and the absence of complaints to doctors about her headaches as reasons for discrediting Plaintiff's testimony about the severity of her symptoms.  (Tr. 19–20.)  In addition, the ALJ noted conflicting evidence regarding Plaintiff's ability to do household chores and care for her children.  (Tr. 20.)

Finally, the ALJ concluded that Plaintiff is able to work.  (Tr. 21–22.) Despite her limitations and considering her age, education, work experience, and residual functional capacity, the Plaintiff is "capable of making a successful adjustment to other work that exists in significant numbers in the national economy."  (*Id.*)  Thus, the ALJ concluded that Plaintiff is not disabled.  (Tr. 22.)

15

## DISCUSSION

### I.   Standard of Review

Congress has prescribed the standards by which Social Security disability benefits may be awarded.  "Disability" under the Social Security Act means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  "An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

Review by this Court of the Commissioner's decision to deny disability benefits to a claimant is limited to a determination of whether the decision of the Commissioner is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); *Baker v. Barnhart*, 457 F.3d 882, 892 (8th Cir. 2006).  "There is a notable difference between 'substantial evidence' and 'substantial evidence on the record as whole.'"  *Gavin v. Heckler*, 811 F.2d 1195, 1199 (8th Cir. 1987) (quotation omitted).  Substantial evidence is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971)

16

(quotation omitted); *see also Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001) (quoting *Beckley v. Apfel*, 152 F.3d 1056, 1059 (8th Cir. 1998)). "'Substantial evidence on the record as a whole,' . . . requires a more scrutinizing analysis." *Gavin*, 811 F.2d at 1199 (quotation omitted). "The substantial evidence test employed in reviewing administrative findings is more than a mere search of the record for evidence supporting the [Commissioner's] findings." (*Id.*) In reviewing the administrative decision, "'[t]he substantiality of [the] evidence must take into account whatever in the record fairly detracts from its weight.'" (*Id.*) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951)).

In reviewing an administrative record for substantial evidence, the Court may not substitute its own opinion for that of the ALJ. *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993). The Court may not reverse the Commissioner's decision merely because evidence may exist to support the opposite conclusion. *Mitchell v. Shalala*, 25 F.3d 712, 714 (8th Cir. 1994) (citation omitted); *see also Woolf*, 3 F.3d at 1213 (concluding that the ALJ's determination must be affirmed, even if substantial evidence would support the opposite finding). The possibility that the Court could draw two inconsistent conclusions from the same record does not prevent a particular finding from being supported by substantial evidence. *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994).

The claimant bears the burden of proving his or her entitlement to disability insurance benefits under the Social Security Act. *See* 20 C.F.R. § 404.1512(a); *Young v. Apfel*, 221 F.3d 1065, 1069 n.5 (8th Cir. 2000); *Thomas v. Sullivan*, 928

F.2d 255, 260 (8th Cir. 1991).  Once the claimant has demonstrated that he or she cannot perform past work due to a disability, "the burden of proof shifts to the Commissioner to prove, first that the claimant retains the residual functional capacity to do other kinds of work, and, second that other work exists in substantial numbers in the national economy that the claimant is able to do." *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000) (citations omitted).

## II.   Analysis of the ALJ's Decision

Plaintiff raises two issues in support of her motion for summary judgment. First, Plaintiff argues that the ALJ erred by failing to adopt reasonable manipulative limitations, despite finding two related severe impairments: bilateral carpal tunnel syndrome and bilateral degenerative joint disease.  (Doc. No. 16, Pl.'s Mem. in Supp. of Mot. for Summ. J. ("Pl.'s Mem.") 5–6.)  Second, Plaintiff argues that the ALJ erred by failing to take into account Plaintiff's migraine headaches when assessing Plaintiff's residual functional capacity.  (*Id.* at 6–7.)

In response, Defendant asserts that the ALJ provided ample reasons for rejecting Plaintiff's allegations of greater manipulative limitations.  (Doc. No. 18, Def.'s Mem. in Supp. of Mot. for Summ. J. ("Def.'s Mem.") 10.)  Similarly, Defendant also asserts that, as for the migraine headaches, though Plaintiff was diagnosed with migraine headaches, she did not actively complain of symptoms throughout the relevant time period.  (*Id.* at 12.)

### A. Whether the ALJ erred at step four when determining, for the purposes of Plaintiff's residual functional capacity, that she has no manipulative limitations.

The ALJ determined that Plaintiff's bilateral carpal tunnel syndrome and degenerative elbow disease were severe impairments, but adopted no manipulative limitations whatsoever based on those impairments. (Tr. 15-16.) This Court finds that the ALJ's failure to adopt manipulative functional limitations resulting from those impairments was not supported by substantial evidence.

The ALJ indicated that weight was given to the opinion of Carrie Affield, P.A., Plaintiff's treating physician's assistant, because it was "consistent with the record and the residual functional capacity" (Tr. 20).  Yet, the ALJ ignored Ms. Affield's specific manipulative limitation whereby the claimant "will have difficulty with repetitive tasks, lifting, or fine movements with her left hand" (Tr. 549).  The ALJ found no manipulative limitations as to either hand or arm.  (Tr. 16.)  The ALJ decision is thus inconsistent with Ms. Affield's described limitations.  The ALJ expressed no basis for rejecting Affield's opinion on limitations and gave no specific reasons for accepting some limitations while rejecting others.  *See Anderson v. Astrue*, 696 F.3d 790, 793 (8th Cir. 2012) ("Ultimately, the ALJ must give good reasons to explain the weight given the treating physician's opinion. 20 C.F.R. § 404.1527 (c) (2).").  The ALJ generally gave weight to Ms. Affield's opinion, but she gave no reasons for discounting specific manipulative limitations described by Ms. Affield, and the Court finds no such reasons in its review of the medical record.

A manipulative limitation was also provided by a consulting state agency physician, Dr. Dan Larson, whose review of the medical evidence led him to state specifically that Ms. Flores "should not do frequent pushing, pulling, gripping, grabbing, etc. with either upper extremity."  (Tr. 391.)  Dr. Larson's opinion was rejected by the ALJ because it was "inconsistent with the treatment notes, reports of treatment providers, and her activities of daily living."  (Tr. 20.)  This Court's review of the treatment notes, reports of treatment providers and Plaintiff's daily living activities shows no such inconsistency that would warrant rejecting Dr. Larsen's opinion.

To the extent that the ALJ's justification for finding no manipulative limitations was based upon the lack of complaints of right hand pain following carpal tunnel surgery in March 2011 (Tr. 19), the Court concludes that the general finding is simply incorrect.  Eight months after the surgery Ms. Flores described shooting pain down the ulnar border of her right hand when driving. (Tr. 450.)  While the pain was suspected to have been due to the genetic elbow condition, the complaint was not questioned, and the existence of post-surgical right side extremity pain is not without a basis in the record.  In addition, the record indicates reduced right hand grip strength and range of motion in December 2011 and January 2012 (Tr. 474, 536, 538, 540), and Plaintiff reported bilateral hand pain through August 2012.  (Tr. 629, 640, 643, 645, 648.) Likewise, with respect to left side symptoms, the ALJ found that Plaintiff had not had left hand complaints until March 2012 (Tr. 20), but the record indicates that

left hand pain and limitations were reported in August 2010 (Tr. 355), and

bilateral pain was indicated in September and October 2010 (Tr. 396, 427) and

April 2011.  (Tr. 452.)

The ALJ also generally found Plaintiff's claims about her manipulative

limitations to be out of proportion with her reports to her medical treatment

providers.  (Tr. 19.)  In that regard the ALJ and the Commissioner note the

several appointments for ailments unrelated to her hands and elbows during

which Plaintiff did not express any complaints of right hand pain or discomfort.

(Tr. 516–21, 526–27, 528–31, 532–35, 542–48.)  While the absence of

complaints about particular medical symptoms certainly could create doubt as to

whether a person has actually experienced the symptoms when complaints come

out of the blue, in this instance there were circumstances to support claims of

ongoing pain and hand manipulation difficulties, including carpal tunnel surgeries

on both wrists and diagnosed advanced bilateral congenital joint malformation in

her elbows which caused both pain and difficulty with arm movement.

Furthermore, other medical visits related to other afflictions, including diabetes

and respiratory problems which were clearly the focus of those visits and

Plaintiff's foremost concern of the moment.  Consequently, this Court concludes

that Plaintiff's failure to report wrist and arm pain does not provide adequate

grounds for a determination that Plaintiff lacked credibility as to the severity of

her subjective complaints.

The ALJ made a somewhat passing reference to Plaintiff's physical therapy attendance record (Tr. 17), but did not expressly describe the significance of the observation.  Defendant suggests that "poor" attendance therapy weighs against Plaintiff's credibility (Def. Mem. 10), and may even provide grounds for denying benefits.  (Def. Mem. 8.)  The record establishes that on several occasions Plaintiff failed to fully comply with her prescribed physical therapy plan.  Following surgery on her right hand, Plaintiff attended only one physical therapy session, though Dr. Williams recommended that she attend twelve sessions.[11]  (Tr. 452–54, 466–69.)  Similarly, after starting to attend physical therapy again on December 30, 2011, Plaintiff attended just four sessions when her doctors recommended she attend eighteen sessions.[12]  (Tr. 474–77, 536–41, 595.)  Following her hearing with the ALJ, Plaintiff started attending her physical therapy sessions with more regularity.  (Tr. 595–621.)  However, notations made during the post-hearing sessions demonstrate that, overall, Plaintiff's rehabilitation potential was fair, her condition was improving, and she was able to complete the majority of session activities with complaints of only mild pain and discomfort.  (Tr. 596–613, 605–06.)

---

[11]   Plaintiff's doctors recommended that she attend physical therapy three times a week for four weeks.  (Tr. 452–54, 466–69.)

[12]   Plaintiff's doctors recommended that she attend physical therapy three times a week for six weeks.  (Tr. 474–77, 536–41, 595.)

Failure to comply with prescribed rehabilitative treatment without good reason may be considered when making a disability determination. *Brown v. Barnhart*, 390 F.3d 535, 541 (8th Cir. 2004) (holding that claimant's noncompliance with prescribed treatment without good reason was evidence supporting the ALJ's conclusion that claimant was not disabled). However, the ALJ only marginally addressed Plaintiff's physical therapy history in her findings (Tr. 17), and she did not expressly discredit Plaintiff's claims for failing to attend physical therapy. Moreover, her attendance at later therapy sessions was significantly more consistent and the ALJ made no directed effort to determine a reason for Plaintiff's spotty physical therapy record. Under these circumstances the Court does not find that Plaintiff's failure to attend prescribed physical therapy provided grounds for discrediting subjective claims when assessing the severity of Plaintiff's hand and arm conditions.

This Court also rejects the notion that Plaintiff's daily living activities were inconsistent with manipulative limitations from serious bilateral arm and hand impairments. At the hearing, Plaintiff reported significant limitations to her daily living activities as a result of her impairments. (Tr. 64–70.) Plaintiff testified that her husband, eldest son, and niece perform a large majority of the housework and childcare. (Tr. 67–70.) Plaintiff also testified that she is able to cook relatively simple meals, do some dishes, and sort laundry. (Tr. 65–67.) On Plaintiff's SSA Function Report, completed on August 11, 2010, she indicated that she was able to do laundry, prepare meals daily, take care of her children,

and clean the house  (Tr. 249–269), but she also indicated that she was limited in these activities because of pain in her elbows and finger, and loss of strength and energy.  (Tr. 254.)  And she had difficulty with simple things such as reaching over her head to dress or shampoo her hair, and holding a spoon and carrying things would cause her hands and elbows to hurt or fall asleep.  (Tr. 255, 259.)  This Court concludes that the claimant's description of her activities of daily living are not inconsistent with medical evidence to the degree that suggests that Plaintiff lacked credibility as to the severity of her subjective complaints on that ground.

Based on the foregoing discussion, this Court concludes that the ALJ erred by failing to give appropriate weight to Plaintiff's subjective complaints of pain and claims of difficulty with hand and elbow manipulation for purposes of the vocational hypothetical.  The Plaintiff's complaints were supported by objective evidence, *i.e.*, bilateral carpal tunnel surgeries and a University of Minnesota medical examination, and an EMG, and there is no persuasive objective evidence to establish her lack of pain or joint manipulation difficulties.  Certainly the Court recognizes the difficulty in establishing evidence to show the absence of pain, but the Court does not find that Plaintiff ability to perform activities of daily living were sufficient, or of a nature, that justifies significantly discrediting Plaintiff's subjective complaints.  Importantly, the medical professional who regularly examined and treated Ms. Flores, Carrie Affield, expressly stated that she would have difficulties with repetitive tasks, lifting, or fine movements with

her left hand due to "chronic arm issues and carpal tunnel on the left." Tr. 549.)

And there is likewise no persuasive reason to reject Dr. Larson's opinion that

Plaintiff could not do frequent handling, fingering and feeling.  However, the ALJ

concluded that Plaintiff would be able to do work based upon a vocational

expert's opinion which relied upon a hypothetical in which the claimant's residual

functional capacity allowed her to "push, pull, grip and grab frequently with either

arm . . . [with] no limits in fingering and feeling . . . The claimant has no

manipulative . . . limitations."  (*Id.*)   In essence, the ALJ simply substituted her

opinion for those of a treating professional and an independent DHS doctor who

reviewed the medical record.  This Court concludes that ALJ's Step five

determination that Plaintiff had the residual functional capacity to perform jobs

that exist in significant numbers was based vocational evidence that was, in turn,

based on a flawed hypothetical which stated that the claimant was able to "push,

pull, grip, and grab frequently with either arm . . . [with no limits in fingering and

feeling.  . . . [and] no manipulative limitations."  (Tr. 16.)  On remand, the ALJ

should determine whether there are jobs in the economy which Plaintiff could

perform taking into account the manipulative limitations associated with Plaintiff's

bilateral carpal tunnel syndrome and degenerative elbow disease placed upon

Plaintiff by the medical experts.

    To the extent that the Commissioner suggests that there is sufficient

vocation evidence to support the ALJ's determination on disability based on the

vocational expert's testimony that the following jobs would be available to an

individual limited to frequent feeling and only occasional pushing, pulling,

gripping, grabbing and fingering: fishing reel assembler, toy and sport equipment

stuffer, and ink printer[13] (Tr. 73-74), the Court finds that the flaw in the underlying

hypothetical is not remedied, as the evidence in the record as a whole does not

establish Plaintiff's ability to perform work involving gripping and fingering, with

no manipulative limitations.

### B. Whether the ALJ erred at Step Four by not adequately accounting for the severity of Plaintiff's migraine headaches in Plaintiff's residual functional capacity.

Pursuant to the standards articulated in *Polaski*, *Moore*, and *Casey*, this

Court finds that the ALJ did not improperly discount Plaintiff's credibility based on

the evidence contained in the record with respect to her migraine headaches.

*Polaski v. Heckler*, 739 F.3d 1320, 1322 (8th Cir. 1984); *Moore v. Astrue*, 572

F.3d 520, 524 (8th Cir. 2009); *Casey v. Astrue*, 503 F.3d 687, 696 (8th Cir.

2007).  Plaintiff started taking medication for her migraine headaches in

December 2009.  (Tr. 363.)  The record contains several references to drugs

prescribed to Plaintiff for her headaches, and the ALJ found headaches to be a

severe impairment (Tr. 15-16), but there is a notable absence of complaints by

Plaintiff to her medical providers regarding pain and discomfort relating to her

migraine headaches.  (*See, e.g.*, Tr. 319–30, 396–403, 418–30, 447–54, 486–88,

---

[13]     Mr. Haagensen stated that there were approximately 900 of these jobs in the regional economy and 45,000 nationally.  (Tr. 73–74.)

508–35, 542–47, 552, 561–94, 629–33, 645–50,  656–58.)  Similarly, Plaintiff complained of symptoms relating to her migraine headaches on only four occasions after the alleged disability onset date, though she saw doctors numerous times each year.  (*See* Tr. 618, 622–28, 634–39, 640–44.)

Furthermore, although Ms. Affield stated, in an addendum to her response to a disability form, that Plaintiff's migraines are uncontrolled, she did not amend or otherwise alter her statement that Plaintiff should not need more than two days off a month.  (Tr. 549.)  Also, on a January 3, 2011 assessment, Ms. Affield estimated that Plaintiff would be absent "about once a month" as a result of her impairments and appointments.  (Tr. 440-445.)  The ALJ accounted for these potential absences during Plaintiff's hearing, and the Vocational Expert testified that "[t]wo days a month would be the maximum threshold for absenteeism." (Tr. 74.)  Therefore, even if Plaintiff's migraines cause her to be absent two days a month, this would not "rule out competitive employment."  (*Id.*)

In conclusion, there is substantial evidence in the record supporting the ALJ's determination of Plaintiff's residual functional capacity with respect to her migraine headaches.  Accordingly, this Court defers to the ALJ's determination with regard to the impact of headaches on Plaintiff's residual functional capacity. *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993).

## RECOMMENDATION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1.   Plaintiff's Motion for Summary Judgment (Doc. No. 15), be

     **GRANTED**;

2.   Defendant' Motion for Summary Judgment (Doc. No. 17), be

     **DENIED**; and

3.   This case be **REMANDED** to the Commissioner under the fourth

     sentence of 42 U.S.C. § 405(g) for further proceedings consistent

     with this Report and Recommendation.

Date: October 6, 2014

                                    _s/ Jeffrey J. Keyes_____
                                    JEFFREY J. KEYES
                                    United States Magistrate Judge

Under D. Minn. Loc. R. 72.2(b), any party may object to this Report and
Recommendation by filing with the Clerk of Court, and serving all parties by
**October 21, 2014** a writing which specifically identifies those portions of this
Report to which objections are made and the basis of those objections.  Failure
to comply with this procedure may operate as a forfeiture of the objecting party's
right to seek review in the Court of Appeals.  A party may respond to the
objecting party's brief within **fourteen days** after service thereof.  A judge shall
make a de novo review of those portions to which objection is made.  This Report
and Recommendation does not constitute on order or judgment of the District
Court, and it is therefore not appealable to the Court of Appeals.